UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                                                :
UNITED STATES MERCHANT MARINE                                   :
ACADEMY ALUMNI ASSOCIATION AND                                 :
FOUNDATION,                                                     :
                                                                :
                          Plaintiff,        :        **COMPLAINT**
                                                                :
            - against -                      :
                                                                :        Case No. 14-CV-5332
UNITED STATES DEPARTMENT OF                                    :
TRANSPORTATION MARITIME                                        :
ADMINISTRATION AND UNITED STATES                              :
DEPARTMENT OF TRANSPORTATION,                                 :
                                                                :
                          Defendants.      :
                                                                :
----------------------------------------------------------------X

## INTRODUCTION

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C §

552, for injunctive and other appropriate relief, including the immediate release of

documents wrongfully withheld by the defendants, the United States Department of

Transportation Maritime Administration and United States Department of

Transportation.

## THE PARTIES

1.       Plaintiff, the United States Merchant Marine Academy Alumni

Association and Foundation (the "AAF"), is a domestic corporation with its principal

place of business at 8 Elmridge Road, Kings Point, New York 11024.

2.      Defendant, the United States Department of Transportation Maritime Administration ("MARAD"), is an agency of DOT, with headquarters at West Building, 1200 New Jersey Avenue, SE, Washington, DC 20590, and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

3.      Defendant, the United States Department of Transportation ("DOT"), is a Department of the Executive Branch of the United States with headquarters at 1200 New Jersey Avenue, SE, Washington, DC 20590, and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction and personal jurisdiction over the parties subject to 5 U.S.C. § 552(a)(4)(B).  This Court also has jurisdiction subject to 28 U.S.C. § 1331.  Venue is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because the plaintiff's principal place of business is in this district.

## FACTS

**A.      Defendants Take Detrimental and Retaliatory Actions**

5.      The AAF is a 501(c)(3) charitable organization, established, through its predecessor organization, over seventy years ago, to benefit the United States Merchant Marine Academy ("USMMA" or "Academy") in Kings Point, New York.  It exists to serve, assist and perpetuate USMMA, its regiment of midshipmen, faculty, staff and alumni.  The AAF supports the Academy's mission of educating and graduating Merchant Marine officers, provides financial support for charitable, scientific and educational purposes, and fosters and supports the development of the Academy. The membership of the AAF consists of all Academy graduates; the

AAF is managed by a board of directors comprised of twenty-one individuals, all of whom, with the exception of the President, are volunteers.

6.      USMMA is a United States service academy administered by MARAD and funded through Congressional appropriations and private gifts, largely with donations from the AAF.

7.      Over the past several years, defendants have taken actions detrimental to the Academy.   The AAF, in compliance with its mission of supporting the Academy, has reported to its members and to Congress on these various actions. In retaliation, defendants have engaged in a course of conduct to undermine the AAF, to silence it, and to dismantle it, despite the damage these actions inflict on the Academy.  As later described in detail, when the AAF exercised its statutory right to obtain documentation with respect to these matters pursuant to the FOIA, defendants delayed and obstructed those efforts, and finally tried to pressure the AAF into withdrawing its requests.

8.      In one instance of detrimental action, in October 2011, defendants, for undisclosed reasons, dismissed the then Superintendent of the Academy, Rear Admiral Philip Greene USN (ret), a highly-qualified, well-respected USMMA graduate with whom the AAF had developed a strong partnership in furtherance of the Academy's goals.  Defendants then stopped hiring USMMA graduates to senior leadership positions at the Academy, and purged the senior leadership of the remaining Academy graduates.  It is the AAF's position that, in the process of selecting the new Superintendent, James Helis, defendants engaged in actions that violated federal merit system principles and federal executive branch ethics policy.

The AAF submitted a complaint to MARAD regarding Mr. Helis' appointment and irregularities in the selection process that resulted in his hiring.

9.      In another instance, defendants closed the USMMA Global Maritime and Transportation School ("GMATS"), a world-renowned continuing education school that brought considerable prestige to the Academy, and enhanced the midshipmen's undergraduate education.  It is the AAF's belief that defendants had no legitimate reason to do so, and deceived the public about the reasons for the closure.  Of particular concern to the AAF was the fact that MARAD did not consider the impact of closing GMATS on the Academy's upcoming accreditation. The AAF has also questioned the legality of defendants' transfer of GMATS' assets upon GMATS' dissolution.

10.     The AAF voiced its concerns regarding the above actions as well as other actions taken by defendants that were not in the best interest of the Academy.

11.     In retaliation, on November 30, 2012, defendants, through the Academy's new superintendent, Mr. Helis, ordered the AAF to vacate the offices it (and its predecessor organization) had maintained on the Academy's campus for over 55 years, and from which the AAF raised money for the Academy and supported its mission.  The reason given by defendants for the eviction was "to be better stewards of taxpayer dollars and to avoid concerns regarding preferential treatment."  The true reason was that defendants were retaliating against the AAF for voicing criticism of defendants' actions that were harming the Academy.  On April 8, 2013, defendants, acting through Mr. Helis, accelerated the eviction date from June 30, 2013 to April 30, 2013.  Because this timetable was impossible for the

AAF to meet, and the Academy refused to provide additional time, the AAF filed a legal action to delay the eviction.  In court, defendants represented that the Academy needed the AAF's office space for use as classrooms, that they had funding in place to adapt the space for classrooms, and that they feared losing the funding if the AAF did not vacate immediately.  However, there were no congressionally-approved plans to convert the office space into classrooms at that time, and no such funding existed.  Superintendent Helis also posted on the Academy's website a list of reasons for the AAF's eviction that were false or misleading.

12.    In an effort to undermine the fundraising efforts of the AAF, and for retaliatory purposes, defendants, acting through Superintendent Helis, began asking donors to send money directly to the Academy, thereby bypassing the AAF.  This action, along with being legally questionable, is in direct conflict with a long-standing agreement between the Academy and the AAF recognizing the AAF as the sole fundraising organization for the Academy.  Defendants went further by removing the reference to the fundraising responsibilities of the AAF from the Academy's website.

13.    In an effort to weaken the AAF even more, defendants used government resources to support a small dissident alumni group called the Kings Point Alumni-Chapter Presidents Alliance ("KPA-CPA"), which, unlike the AAF, is not a non-profit charity, and whose business practices have been challenged by the AAF. Defendants' actions were punitive, and materially harmed the AAF, which relies on donation revenue for its support of the Academy, and to pay for its operations.

**B.** **The FOIA Requests**

14.     Because defendants engaged in numerous acts adverse to the best interests of the Academy, and wrongfully sought to retaliate against the AAF, the AAF served FOIA requests tailored to obtain evidence regarding specific wrongful actions of defendants. The FOIA Requests seek information that defendants are required by law to produce.

15.     On April 24, 2013, the AAF served its first FOIA request.  That request sought specific records relating to the selection process for the position of the USMMA Superintendent.

16.     On April 25, 2013, the AAF served its second FOIA request seeking certain records relating to: (a) leases between defendants and specifically-identified parties; (b) USMMA's decision to raise private funding on its own; (c) private donations made directly to USMMA; and (d) the decision to close down GMATS and the entity operating the Officer's Club, both of which had been recipients of large AAF donations.

17.     On May 2, 2013, the AAF served a third FOIA request seeking certain documents relating to: (a) defendants' fundraising activities on behalf of the USMMA; (b) the decision to reject the AAF's gift offer of a strategic plan; (c) the decision to not support the AAF's proposal to fund and construct a USMMA athletic facility; (d) the sale of academy-related merchandise on the KPA-CPA website; and (e) the decision to decline to assist the AAF in its efforts to obtain approval of the Village of Kings Point, New York to convert a house owned by the AAF for use as an office and an Academy Visitors' Center.

18.     On May 3, 2013, the AAF served a fourth request seeking documents relating to a particular letter pursuant to which the USMMA Superintendent evicted the AAF from its office space, statements by the USMMA Superintendent in a particular letter regarding services provided by the AAF, the decisions to eliminate the use of Non-Appropriated Fund Instrumentalities ("NAFIS") at the Academy and to close down GMATS, and the disposition of NAFI and GMATS assets.

19.     On May 6, 2013, the AAF served a fifth request seeking documents relating to the removal of two specific USMMA Superintendents, a specific deputy Superintendent and a specific Deputy Maritime Administrator at MARAD, the selection process for the Superintendent, the prohibition on the sale of tickets and programs at USMMA sporting events, the firing of assistant coaches, non-competitive appointments, failure to timely order textbooks and supplies for Midshipmen at USMMA, and the removal of a particular training ship from USMMA.

20.     On May 7, 2013, the AAF served a sixth request seeking information on a carbon monoxide incident at the Academy.

21.     On May 8, 2013, the AAF served a seventh request seeking documents relating to the use of the USMMA website to provide a link to the KPA-CPA website, the defendants' acceptance of gifts from the KPA-CPA, correspondence with particularly-identified parties, documents relating to one particular letter, and documents relating to one particular meeting.

22.     On May 9, 2013, the AAF served an eighth request seeking documents relating to the fundraising proposals of one named individual and correspondence with that one individual.

23. On May 28, 2013, the AAF served a ninth request seeking communications between defendants' employees and specifically-identified parties, and communications relating to one specifically-identified person.

24. On September 14, 2013, the AAF served its tenth request seeking notes of meetings and copies of visitor logs.

25. On May 9, 2014, the AAF served its eleventh request seeking communications of certain identified employees of defendants relating to the AAF's legal representation and legal actions concerning the AAF, and communications between defendants and Congress related to the AAF.

26. Each of these requests was directed at a specific aspect of defendants' wrongdoing, and defendants were required to produce the documents requested in a timely fashion.

## C.   Defendants' Responses to the FOIA Requests

27. Rather than comply with their statutory obligations to produce the requested documents, defendants, for over fifteen months, have engaged in a concerted effort to delay and obstruct the AAF's statutory right to receive the documents requested.

28. By letters dated May 23, 2013, MARAD responded to the first eight requests by asking the AAF to specify the maximum amount of fees it was willing to pay to process each request, and the fee category relating to each request. MARAD concluded: "MarAd will initiate processing and perform a search for responsive records upon receipt of your complete FOIA request."

29.     The AAF responded by stating that it was willing to pay fees as high as anticipated by MARAD, and that the requests fell under the "Other" category because they were not for commercial use, or use by news media, educational institutions or noncommercial scientific institutions.  The AAF also included this information in its subsequent requests.

30.     By letter dated June 14, 2013, the AAF notified MARAD that its time to respond to the first eight requests had expired and asked when a response could be expected.

31.     By letter dated June 26, 2013, MARAD stated that it estimated the cost to perform a search of records in MARAD's possession to be $21,214.21, and requested payment of at least half of the amount.  MARAD further stated:

> After the search is completed, or in the event that the search costs exceed the estimated amount, the agency will provide you with either a detailed invoice reflecting the actual search amount or an invoice reflecting the revised estimated search amount. Payment for either the balance or additional estimated charges will be required at that time.

32.     On July 15, 2013, the AAF made a payment of $11,000 by electronic transfer, as requested by MARAD.

33.     On July 23, 2013, three months after the AAF's first request, MARAD requested that the AAF narrow or prioritize its requests.  The AAF responded by narrowing its requests pertaining to the hiring of the USMMA Superintendent.  By email dated July 24, 2013, Mr. T. Mitchell Hudson, Attorney and FOIA Officer for MARAD, confirmed that he had "advised that narrowing the scope and or prioritizing items could result in a more timely production of meaningful records," and that the AAF had narrowed its requests.  He stated: "Thank you for helping my

office focus on the issues that matter most to your client.  The narrowed request will assist us greatly in managing our resources and should result in a faster response."

34.     Mr. Hudson further advised in his July 23 letter that MARAD had merged and reorganized the AAF's requests.

35.     By letter dated August 20, 2013, the DOT Office of the Secretary (OST) advised that certain items in the May 6, 2013 request had been forwarded to it.  OST stated that the request would require email searches of nine officials, and estimated the cost at $3,772, based on 4 hours for each of the three officials who were currently in OST and 6 hours for each of the six officials who were no longer with OST.  OST represented that it would begin its search when it had received half of the fee estimate.

36.     By a second letter dated August 20, 2013, OST advised that an item in the May 9, 2013 request had also been forwarded to it, but that if the records had already been pulled for the May 6, 2013 request, "[t]here will be no charge for this request, since we believe the search is simple and can be conducted within two hours."

37.     By check dated August 28, 2013, the AAF paid OST the full estimated charge of $3,772.  Thus, as of that point in time, AAF had made payments in excess of those requested by OST.

38.     By letter dated September 23, 2013, OST advised that portions of the May 8, 2013 request had been forwarded to it, and that the request would require email searches of four OST officials, three of whom were no longer with OST.  OST estimated the cost at approximately $1,148 based on four hours of search time for

each of the four OST officials.  OST requested half of the estimated search cost, or

$571. The AAF had already remitted $1,668 more than was at that time required,

and did not remit further payment.

39.     By a second letter dated September 23, 2013, OST advised that a

portion of the May 2, 2013 request had been forwarded to it, but that because the

estimated cost for email searches of five OST officials was less than $250, no pre-

payment was required.

40.     Having already narrowed the FOIA requests in response to MARAD's

July 23, 2013 suggestion that the AAF either narrow or prioritize its requests, the

AAF, in the spirit of cooperation, sought to further assist defendants by also

prioritizing the requests.  In or about October 2013, the AAF designated its FOIA

request dated May 28, 2013 as its Priority Request.  Thus, as of November 2013,

approximately six months after most of the FOIA requests had been served, the AAF

had made all payments that had been requested, and had narrowed and prioritized

its requests, as had been requested.

### D.     Defendants Obstruct The AAF's FOIA Rights

41.     In a November 20, 2013 meeting, MARAD's Executive Director, Joel

Szabat, proposed to the AAF Chairman, Connie Buhl, that they negotiate the

withdrawal of the AAF's FOIA requests.  Ms. Buhl declined.  In subsequent

conversations, Mr. Szabat then began to condition the AAF's return to offices on the

Academy -- from which defendants had inexplicably evicted the AAF -- to the AAF's

withdrawal of its FOIA requests.

42.     In late December 2013, seven months after the May 28 Request had been sent (and two months after it had been designated as the Priority Request), MARAD still had failed to produce any documents.  MARAD claimed it was awaiting receipt of new computer software to search for emails asked for in the Priority Request, and stated that the first responsive documents would not be released until the end of January 2014.  However, the AAF had been informed months earlier, in the summer of 2013, that new computer hardware and software had been acquired by MARAD to process FOIA requests.

43.     The AAF tried to assist MARAD further.  By letter dated December 24, 2013, the AAF asked that the May 28 Priority Request be focused even more narrowly on a small sub-set of items in the Priority Request.  That sub-set asked for only emails from one current USMMA official to three individuals, restricted to a ten-month time period.  It is difficult to fathom why such a simple request would require special software.  To date, not a single email has been produced in response to that narrowed Priority Request.

44.     On March 20, 2014, MARAD was asked by e-mail once again "to concentrate on our May 28, 2013 priority FOIA request responses."

45.     In the time period from July 30, 2013 through March 11, 2014, MARAD produced documents in a series of submissions, each of which it described as a "partial response" to four of the ten FOIA requests.  (An additional "partial response" to one of the same four requests was received on August 14, 2014.)  Many of the documents produced in these "partial" responses were heavily-redacted.  In

12

each case, the cover letter stated: "Please note that this is not our final response to your request."

46.     Even though the AAF, in October 2013, had designated its May 28, 2013 Request as its Priority Request as MARAD had asked it to do, MARAD produced no documents regarding the Priority Request until February 28, 2014 when it provided 87 pages in what was described as a "first partial response" to the May 28, 2013 request.   Again the cover letter stated: "Please note that this is not our final response to your request."  Although MARAD claimed the documents were being produced as a partial first response to the Priority Request, in fact, the documents were only peripherally related to the Priority Request, and none pertained to the narrowed Priority Request.  After having asked the AAF to prioritize its Requests, MARAD has produced no further response to the Priority Request.

47.     In fact, it appears that MARAD's practice has been to "cherry pick" the most inconsequential items from the AAF's requests, and then to produce those items in a heavily-redacted form so as to render many of the documents useless.

**E.**     **Defendants Again Pressure the AAF to Withdraw Its FOIA Requests**

48.     In a meeting on April 7, 2014, MARAD informed the AAF that, unless the AAF agreed to withdraw the FOIA requests and to keep silent with respect to the management of the Academy, MARAD would refuse to allow the AAF to return to the campus.  The AAF responded that withdrawal of the FOIA requests was not a matter for negotiation.

49.     On April 8, 2014, the AAF sent a proposal including five different gift options from the AAF for an AAF- financed Visitors' Center and Alumni House.  Each option included the donation of the Lerner House, a property purchased by the AAF in 2009 for $2.1 million from a private owner and situated within the perimeter boundaries of the Academy.  The proposed donation provided for the Academy's use of the Lerner House for housing, and ensured that the property would never fall into private hands and endanger the security of the Academy.

50.     On April 10, 2014, in a conversation between the Acting Maritime Administrator, "Chip" Jaenichen and the AAF's Public Affairs consultant, Jerry Rehm, Mr. Jaenichen insinuated that MARAD would not respond to the AAF's gift offer of a Visitors' Center and Alumni House to the Academy, unless the AAF withdrew the FOIA requests.  In subsequent communications with the AAF, MARAD continued to state or imply that it would refuse consideration of the AAF's gift offer of a Visitors' Center and Alumni House to the Academy, unless the AAF withdrew its FOIA requests.  Obviously, this refusal of such a meaningful gift is not in the best interests of the Academy.

51.     Also on April 10, 2014, MARAD's Executive Director, Mr. Szabat informed the AAF by email that defendants were dramatically revising by "several multiples" their original $20,000 cost estimate to produce the FOIA documents.  In a subsequent phone call, Mr. Hudson informed Mr. Forde that the new estimate would be $89,000, including $8,000 for the priority request.

52.     In the same e-mail, MARAD's Executive Director, Mr. Szabat, stated that the AAF would not be permitted to return to office space on campus unless it

ceased "to lobby/campaign against us [MARAD] whenever we disagree."  When the AAF sought specific answers as to what Mr. Szabat meant by "lobby/campaign against," Mr. Szabat, in an email dated April 18, 2014, responded by stating that among the AAF's "hostile actions" was its request for documents under FOIA: "The AAF has every right to FOIA government documents.  But nothing positive can come of this request."

53.    In a further effort to dissuade the AAF from exercising its rights under FOIA, Mr. Szabat suggested that the AAF's actions in seeking FOIA information could prove to be dangerous: "If the FOIA reveals unflattering information about alumni who are not friends of the AAF, that will only encourage those alumni to FOIA and release any correspondence between DOT and the AAF that might paint the AAF in a bad light.  This could easily take years to play out, and increasingly embitter relations every step of the way."  To the AAF's knowledge, however, there is no such correspondence that would "paint the AAF in a bad light."

54.    On April 16, 2014, Ms. Buhl spoke with MARAD's Acting Associate Administrator for Business and Finance Development, Owen Doherty, who reiterated that if the AAF withdrew its FOIA requests, defendants would consider allowing the AAF to return to the Academy's campus.  Mr. Doherty also asked what the AAF intended to do with the FOIA information once it received it.

55.    Ms. Buhl followed up the phone call with an e-mail to Mr. Doherty on April 17, asking whether there was "a way forward for the AAF to get back on campus without having to pull the FOIA requests?"  Mr. Doherty responded by email dated April 18 that trust needed to be restored, and that "[d]ropping the foia and

15

concurrently agreeing on a plan to put the USMMAAAF back on campus is the most expedient means to gain that trust."  While saying the opposite, Mr. Doherty left no doubt that the AAF's return to campus was conditioned on its withdrawal of the FOIA requests: "I have not been told that dropping the foia needs to be a pre-condition to getting back on campus, but I do not see us moving forward otherwise."

**F.      Defendants Use Surrogates to Pressure
the AAF into Withdrawing the FOIA Requests**

56.     To achieve its goal of forcing the AAF to withdraw its FOIA requests, MARAD colluded with certain USMMA graduates, with whom MARAD has close business or personal relationships, to pressure the AAF into withdrawing the FOIA requests and accepting the refund.

57.     Upon information and belief, on or about June 17, 2013, shortly after receiving the FOIA requests, MARAD contacted a number of USMMA graduates, including several members of the KPA-CPA, a dissident alumni organization (*see* paragraph 13, *supra*), to inform them that the AAF had filed FOIA requests seeking all communications involving certain individuals, and that it would take hundreds of hours of work to process the requests for which the AAF would have to pay a substantial fee.

58.     The very next day, a graduate with close personal ties with MARAD senior officials called Ms. Buhl to complain that the requests were frivolous and were overburdening MARAD.  Within days, the AAF became the target of e-mails and Facebook postings from dissidents critical of the FOIA requests and the use of AAF money to pay the requisite fees.

59.     On July 16, 2013, the then Chairman of the AAF, Charles Hill sent an e-mail to Mr. Jaenichen advising him that "someone at MARAD has selectively informed habitual critics of the AAF of FOIA requests made on behalf of the AAF;" that "the selective feeding of this information to these critics, and the fact that it was inaccurate and exaggerated, indicates an intent to inflame alumni, through surrogates, against the AAF;" and asking him to "look into this and determine what happened."

60.     Mr. Jaenichan responded by e-mail on July 19, 2013 and stated: "MARAD is processing the FOIA requests as required by law.  In doing so, certain individuals subject to the FOIA request were notified that the request was being processed and that correspondence would be provided as requested with the caveat that personal information not allowed to be released would be redacted."  However, Mr. Jaenichen did not explain why only dissidents had been contacted among the dozens of individuals who were named in the FOIA requests, or why details of the FOIA requests had been released to the dissidents, including comments on the processing fees.

61.     As of this date, over one year later, no documents involving any of the contacted dissidents, for whom Mr. Jaenichen expressed so much concern, have been released by MARAD to the AAF.  If there are no documents, the alert to the dissidents did not serve the purpose represented by Mr. Jaenichen.  If there are documents, MARAD has been sitting on them for over one year.

62.     Graduates with close business or personal ties with MARAD then began to lobby board members to withdraw the FOIA requests, claiming that they

were overwhelming the MARAD legal staff, that the release of the documents would embarrass MARAD and certain graduates, that they were causing friction between MARAD and the AAF, that the AAF would never be let back on campus unless they were withdrawn and that the AAF was wasting donor money.  After MARAD offered the AAF a refund in exchange for the AAF's withdrawal of the FOIAs, as discussed below, a graduate with close ties to MARAD publicly announced MARAD's offer, and demanded that the AAF accept it.

**G.      MARAD Offers to Give the AAF a Refund on Condition That the AAF Withdraw the FOIA Requests and Then Claims the Requests are Tolled**

63.      In or about April 2014, MARAD informed the AAF that if it agreed to withdraw its FOIA requests, MARAD would refund the money already paid by the AAF for the requests, provided that the AAF did not require an invoice for the work already performed.

64.      On May 12, 2014, MARAD's Executive Director, Mr. Szabat reiterated in an email to the AAF Chairman, Ms. Buhl, that the AAF would not be allowed to return to campus if it continued "campaigning against a federal agency's policies." Mr. Szabat again said that MARAD "had the ability to waive the entire fee, including the $11,000(?) already paid, if the FOIA is withdrawn."  Mr. Szabat stated, however, that once MARAD sent the invoice to the AAF for the work done, "it will not be possible for us to waive the fee."

65.      In a telephone conference on May 13, 2014, Mr. Hudson, Attorney and FOIA Officer for MARAD, and Christine Gurland, Assistant Chief Counsel for Legislation and Regulations at MARAD, informed the AAF's legal counsel, James Forde, for the first time that MARAD was demanding more money from the AAF to

process the FOIA requests.  Specifically, they stated that MARAD had exhausted the

$11,000 advance payment made by the AAF, and had spent an additional $2,361, in

responding to the AAF's FOIA requests.  They proposed four options: (a) they

reiterated MARAD's offer to refund the money paid to MARAD in return for the

AAF's agreement to withdraw the requests, and added that they would waive the

$2,361.00 (but would not produce the extra documents that corresponded to this

amount); (b) AAF could pay the $2,361.60, MARAD would release the documents it

was withholding until that amount was paid, and then the AAF would withdraw its

FOIA requests; (c) the AAF could pay an additional $11,000, and MARAD would

continue to process the FOIA requests until these funds were spent; or (d) the AAF

could pay the new estimate total of $89,812.50, and MARAD would continue to

process the FOIA requests, presumably until these funds ran out.   Mr. Hudson also

informed Mr. Forde that another option was to agree to toll all the requests

excepting the May 28 Priority Request.

66.     By email dated May 15, 2014 to Mr. Hudson, Mr. Forde asked MARAD

for a breakdown of how the $13,500 had been spent, the legal basis for providing a

refund and an explanation as to how the "tolling" process would work.

67.     In an email dated May 19, 2014, Mr. Hudson stated: "At this point in

time your requests have been tolled for fees.  Meaning, no work is being done at this

time."  Mr. Hudson stated again: "As it stands, your 10 requests are tolled for a fee

payment issue."  This was the first notice that the AAF received from MARAD that

work on the FOIA requests had ceased and it came as a complete surprise. The

tolling was contrary to the terms of the FOIA statute and MARAD's own

representations when it requested payment of the initial $11,000, and agreed to continue work until its search costs exceeded the estimated amount of $22,214.21 (*see, supra* ¶ 31).  Further, not only did MARAD have no right to demand more money, the AAF later learned (*see, infra* ¶ 72)*,* that MARAD had ceased all work on the requests over a month before it even demanded the additional funds.

68.     In the same email, Mr. Hudson repeated the offer to provide a refund to the AAF in the event it would agree to withdraw the requests.  He stated that it was MARAD's position that a refund could be issued, because "when money has been paid for government services and those services have not been provided or the amount of services were less than estimated, the Treasury can refund the advance payment."  Mr. Hudson suggested, however, that the refund option was not available if the AAF insisted on receiving an invoice or an accounting of the work that had been done.

69.     Moreover, according to MARAD, the funds AAF had paid had already been spent on processing its FOIA requests.  Hence, MARAD was in effect offering to pay money that belonged to the U.S. Treasury, in exchange for the AAF agreeing to not exercise its statutory rights.  Upon information and belief, MARAD did this because it believed the information it was required to produce would be embarrassing and damaging to certain MARAD and DOT personnel.  In fact, Mr. Hudson claimed that emails the AAF was requesting were embarrassing to all sides.

70.     Although, at this point, the FOIA requests had been pending for about one year, and MARAD had not asked the AAF to narrow the requests beyond what had been agreed to in July, in his May 19, 2014 email, Mr. Hudson stated: "[W]e

believe that narrowing your requests would prove to be a better approach."
However, he offered no advice on how the requests could be narrowed.  Further,
even though MARAD had just provided the new exorbitant cost estimate of $89,000,
Mr. Hudson now stated that, as to the requests, he was unable "to foresee a
timeframe for their conclusion and a final cost estimate."

71.     By email dated June 9, 2014, Christine Gurland, Assistant Chief
Counsel for Legislation and Regulations at MARAD, advised that MARAD would
provide a refund, if the AAF agreed to withdraw the requests, because MARAD had
erred in accepting the requests without providing the AAF with an opportunity to
narrow them.  Ms. Gurland repeated that the option for a refund would cease to be
available once an invoice was issued.

72.     Ms. Gurland informed Mr. Forde for the first time that MARAD had
done no work on the AAF's requests since April 4, 2014 "when it was determined
that your client's fee advance had been exhausted."  Ms. Gurland asserted that the
AAF's requests were tolled.  Ms. Gurland further asserted that MARAD had the right
to "seek advance payment before actual duplication or delivery of releasable
records, because we have determined that charges are likely to exceed $250."

73.     Ms. Gurland, like Mr. Hudson, ignored the $89,000 cost estimate
delivered two months earlier, and claimed, over one year after the FOIA requests
had been served, that it was "nearly impossible to reasonably project" "the total cost
or time to complete" the requests.  She concluded: "Therefore, refunding the fees
paid by your client is a reasonable option for both MARAD and your client."

**H.**     **The AAF's Response to MARAD**

74.     By letter dated June 18, 2014, counsel for the AAF responded to Ms.

Gurland's email, and among other things, noted the following:

a.     Pursuant to 5 U.S.C. § 552(a)(6)(A), defendants were required to respond to AAF's requests within 20 working days.  Defendants failed to comply with the time limit set forth in 5 U.S.C. § 552(a)(6)(A).

b.     While the 20-day time period under 5 U.S.C. § 552(a)(6)(A) can be extended to 30 days, or, in certain cases, longer, in the presence of unusual circumstances, defendants failed to follow the procedures for extending the time period as required under 5 U.S.C. § 552(a)(6)(B); 49 C.F.R. § 7.34(a).

c.     In its initial responses to the AAF's requests, defendants did not provide a date on which it expected to issue a determination, and over one year after the requests were submitted, still refuses to provide a date.  Instead, MARAD insists, one year after the requests were submitted and long after its responses were due, that MARAD is unable "to reasonably project their total cost or time to complete."

d.     MARAD's position that it is willing to issue a refund but only if the AAF agrees to drop its pending FOIA requests has no legal basis in the FOIA statute or DOT implementing regulations, and conflicts with public policy and the fundamental principles of the Act to promote open access to government.  If, as MARAD suggests, a refund is owing to the AAF because MARAD mishandled the requests, then MARAD has an obligation to issue a refund.  MARAD has no right, however, to condition an offer to provide a refund on an agreement by the AAF to relinquish its rights under FOIA to which it is entitled.  (Likewise, neither the FOIA statute nor the regulations offers any support for MARAD's position that it cannot issue an invoice until the refund issue is resolved.)

e.     Under the FOIA statute and DOT implementing regulations, there can be no tolling unless the agency first requests information or clarification regarding fees, in which case, the tolling period ends when the FOIA requester responds to the agency's request.  5 U.S.C. § 552 (a)(6)(A)(ii)(II); 43 C.F.R. §§ 7.35 and 7.45.  There are no such outstanding requests by MARAD in this case.

f.     MARAD's assertion that it may "seek advance payment before actual  duplication or delivery of releasable records, because we have determined that charges are likely to exceed $250," confuses the

requirements of (a) advance payment (i.e. before work is commenced or continued); and (b) payments before duplication or delivery of releasable records.  The distinction between the two types of payments is set forth in 49 C.F.R. § 7.45, the very section of the DOT regulations on which MARAD relies.  In the former case, DOT is required to notify the requester of the estimated cost.  "If the requester has a history of prompt payment of FOIA fees, the requester must furnish satisfactory assurance of full payment of the estimated charge.  Otherwise, the requester may be required to make advance payment of any amount up to the full estimated charges."  The AAF has a history of prompt payments to MARAD.  Indeed, it has already provided MARAD with $11,000, and, in its FOIA requests, has assured MARAD of its willingness "to pay fees as high as anticipated by the D.O.T. and USMMA."  Prior to stopping work, MARAD never informed the AAF of any estimated charges as required, and never requested an advance payment beyond the $11,000.

g.      There is no provision in the statute or in the DOT regulations that would justify MARAD's unreasonable actions in stopping all work on the basis that payments were required, without any notice to the AAF requesting further assurance of full payment, or notice of any estimated charges.  Further, there is no basis for MARAD's argument that its time to respond to the requests had been tolled, after its time to respond had long expired.  If, on the other hand, MARAD meant to rely on the terms of the regulation that allow it to demand payment before duplication or delivery of materials, those terms obviously presuppose that documents have been identified and are awaiting duplication and delivery.  The AAF advised MARAD that if the latter were the case, then the AAF requested that MARAD provide it immediately with an invoice setting forth the costs of duplication and/or delivery.

h.      Moreover, the AAF pointed out that MARAD's position was directly contrary to the representations it made to the AAF when it requested payment of the $11,000 pursuant to its letter of June 26, 2013 (*supra* ¶ 31).  In that letter, MARAD stated:

> After the search is completed, or **in the event that the search costs exceed the estimated amount** [i.e. $21,214.21], the agency will provide you with either a detailed invoice reflecting the actual search amount or an invoice reflecting the revised estimated search amount.  Payment for either the balance or additional estimated charges will be required at that time.

23

MARAD stated that search costs then stood at $13,362, and, so did not exceed the estimated amount of $21,214.  Thus, according to MARAD's own representations in its June 26, 2013 letter, no payment was due.  Further, even if search costs did exceed the estimated cost, no payment would be due in any event, because MARAD had not –and still has not –provided the AAF with any invoice.

i.       MARAD cannot retroactively object, over one year after the AAF's first FOIA requests were made, that the requests are too broad and that MARAD erred in responding to them.  The fact is that MARAD did accept the requests, and the AAF has been waiting for a response for over a year.  Also, if MARAD believed the requests were too broad, it had an obligation under the FOIA to make available its FOIA Public Liaison "to aid the requester" and "to assist in the resolution of any disputes."  5 U.S.C. § 552(a)(6)(B)(ii).  MARAD failed to do so.

j.       Moreover, the AAF has consistently demonstrated a willingness to cooperate with MARAD.  In July 2013, the AAF narrowed its requests in response to MARAD's suggestion, and MARAD expressed its satisfaction with that resolution.  Then in or about October 2013, the AAF requested that priority be given to its May 28, 2013 request.  When MARAD failed to produce any documents in response to the May 28 request, the AAF tried to further assist MARAD in December 2014 by the AAF asked that priority be focused even more narrowly on a small sub-set of items in its May 28 request.  This narrowed priority request asks for communications in the form of emails from only one individual, James Helis, to three specific individuals within a 10-month time period.  Yet, inexcusably, MARAD still has produced no documents responsive to this very narrow request, which should have required no more than the standard statutory 20-day time limit for a response.

75.     The AAF demanded that MARAD respond to its Priority Request, and expressed its willingness to cooperate on a schedule for the production of the remaining documents.

I.     **Defendants Continue Their Obstructive Course of Conduct**

76.     Counsel for the AAF reasonably requested that MARAD respond to the letter in 20 days.  MARAD did not respond until 48 days later by letter dated August 5, 2014.  In that letter, MARAD makes clear that it intends to stay on course,

continuing to openly violate the FOIA, to serve useless "partial responses" for an additional eighteen-month period, and now to charge the AAF, an estimated $90,000, more than four times its initial estimate.  In this regard, it appears that MARAD's tactic is that, having failed to pressure the AAF into withdrawing its requests, it will now quote an outrageous fee (and response time) for the requests, with the expectation that the AAF, as a not-for-profit charity, will be forced to surrender its rights to the information it seeks under the FOIA.

77.     In the August 5 letter, MARAD argues that it has made "significant progress" in processing the AAF's ten FOIA requests.  However, the costs MARAD claims to have accrued of $13,362.50 are less than 15% of its current estimate of $90,000 to complete work on the ten requests.  Thus, if MARAD continues at the same rate, it will take over 7 years to complete the work.

78.     In the August 5 letter, MARAD contends that "all partial releases of information by MARAD have met the applicable legal timing requirements for requests containing unusual circumstances."  MARAD's statement is unsupportable under the terms of the FOIA.  There is simply no provision in the FOIA that permits an agency to drag out its responses to FOIA requests over what MARAD now estimates will be a 34-month time period from when the AAF served its first request.

79.     In order to extend the 20-day period for a determination with respect to each FOIA request, MARAD was required to notify the AAF in its initial response to each request of "the date on which a determination is expected to be issued."  MARAD failed to do so, and thus cannot claim "unusual circumstances."  After

steadfastly refusing to provide a date for its expected determination, and arguing that it could not "reasonably project" the time to complete the requests, MARAD cannot now argue that it is entitled to an additional eighteen months to process the requests. Its time to issue a determination has long expired, and MARAD, has, in any event long exceeded the overriding requirement of FOIA that the records be made "promptly available."

80. Tellingly, in the letter of August 5, 2014, MARAD makes absolutely no mention of its offer of a refund, and does not respond to the AAF's questions regarding the legal basis for its position that it would issue a refund, but only if the AAF would drop its pending FOIA requests. Instead, MARAD now attempts to couch its improper attempts to pressure the AAF into withdrawing its requests as a "request for a fee clarification" and the letter by the AAF's counsel as "the final response to MARAD's May 7, 2014 request for clarification." MARAD's improper offer of a refund to pressure the AAF into withdrawing its FOIA requests, under no circumstances, can be considered a request for a fee clarification within the meaning of the FOIA statute. The fact is that the AAF had paid the fees, and, as MARAD now concedes, no funds were owing. Thus, MARAD had absolutely no need, and correspondingly, no right, to seek a fee clarification, and, in fact, did not request a fee clarification.

81. For the same reasons, MARAD's "tolling" of the AAF's requests, begun without notice and continued without cause, for over four months for an alleged "fee clarification" constitutes a blatant violation of the FOIA statute. Further, MARAD indicates that it intends to toll the FOIA requests again in violation of the

26

FOIA for future fee clarifications, even though the AAF has already stated a willingness to pay fees as high as anticipated, and no legal basis exists for further "fee clarifications."

82.    DOT has provided no records requested by the AAF in its FOIA requests.

83.    MARAD and DOT have failed to comply with the time limits set forth in 5 U.S.C. § 552(a)(6)(C).

84.    The AAF has exhausted administrative remedies with respect to the FOIA requests to defendants as required by 5 U.S.C. § 552(a)(6)(C)(i).

### Claim for Relief

85.    The AAF realleges paragraphs 1 through 84 as if fully set forth herein.

86.    Defendants are wrongfully withholding records requested by the AAF pursuant to 5 U.S.C. § 552.

WHEREFORE, the AAF respectfully requests that the Court:

(a) order defendants to produce, by a date certain, all records responsive to the AAF's Priority FOIA requests;

(b) order defendants to produce, by a date certain, all records responsive to the remainder of the AAF's FOIA requests;

(c) order defendants to produce a *Vaughn* index of any responsive records withheld, or redacted, under claim of exemption; and enjoin defendants from withholding or redacting any non-exempt records responsive to the AAF's FOIA requests;

(d)  grant the AAF a refund of all search fees incurred by defendants to date, as well as a waiver of any additional search fees, pursuant to 28 U.S.C. § 552(a)(4)(viii), and other terms of the FOIA, based on defendants' failure to comply with the time limits and terms of the FOIA governing fees.

(e)  grant the AAF a refund of duplication fees paid to date, and a waiver of future duplication fees, to the extent that such fees exceed "reasonable standard charges" within the meaning of 28 U.S.C. § 552 (a)(4)(ii) , or otherwise fail to comply with the terms of the FOIA;

(f)  grant the AAF an award of attorneys' fees and costs incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E);

(g)  issue a written finding, pursuant to 52 U.S.C. § 552(a)(4)(F)(i), that the circumstances surrounding defendants' withholding raises questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, so as to mandate the initiation of a proceeding by the Special Counsel; and

(h)  grant the AAF such other relief as the Court deems just.

Dated: New York, New York
        September 12, 2014

                                    SENTNER SAFRAN LLP

                          By:     _/s/Victoria L. Safran_____
                                  Victoria L. Safran
                                  250 Park Avenue, Suite 700
                                  New York, New York 10177
                                  (212) 390-1720
                                  vsafran@sentnersafran.com
                                  *Counsel for Plaintiff*